**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:13-cr-20801-WPD-1

LUIS ENRIQUE RENTERIA GRANADOS,

      Movant,

v.

UNITED STATES OF AMERICA,

      Respondent.

_____/



FILED BY_____ D.C.

MAY 0 4 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## MOTION FOR COMPASSIONATE RELEASE/REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) AND THE FIRST STEP ACT OF 2018

COMES Movant, LUIS ENRIQUE RENTERIA GRANADOS ("Granados"), appearing *pro se,* and respectfully moves the Court under 18 U.S.C. § 3582(c)(1)(A)(i) to modify his sentence and immediately release him to home confinement and a period of supervised release. The unprecedented threat of COVID-19 could not have been foreseen at sentencing, and poses extraordinary risks to Granados' health. The virus thrives in densely packed populations, and the FCI is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for Granados. Granados' diagnosed medical conditions make him especially vulnerable to the deadly risks of COVID-19. Allowing Granados to finish out his sentence at home is the only prudent response to the extraordinary and compelling circumstances created by the novel Corona virus.

1

# I. JURISDICTION

The district court's jurisdiction to correct or modify a defendant's sentence is limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582. The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is extremely limited. *Dillon v. United States*, 130 S.Ct. 2683, 2687(2010). It is black-letter law that a federal court generally "may not modify a term of imprisonment once it has been imposed." *Id.* However, Congress has allowed an exception to that rule "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

# II. STATEMENT OF THE CASE

## A.   Procedural Background

On October 17, 2013, a grand jury sitting in the United States District Court for the Southern District of Florida, Miami Division, returned a one (2) count Indictment charging Granados and four other co-defendants. See Doc. 3.[1] Count 1 charged Granados with Conspiracy to Possess with Intent to Distribute 5 Kilograms or More of Cocaine While on Board a Vessel Subject to the Jurisdiction of the United States, in violation of 46 U.S.C. § 70506(b). *Id.* The Indictment also contained a Criminal Forfeiture pursuant to 21 U.S.C. § 853. *Id.*

---

[1]    "Doc." refers to the Docket Report in the United States District Court for the Southern District of Florida, Miami Division in Criminal No. 1:13-cr-20801-WPD-1, which is immediately followed by the Docket Entry Number. "PSR" refers to the Presentence Report in this case, which is immediately followed by the paragraph ("¶") number.

On December 8, 2016, a Change of Plea Hearing was held and Granados pled guilty to the

1-count Indictment, pursuant to a written Plea Agreement. See Docs. 66, 67.

On February 24, 2017, Granados was sentenced to a term of 120 months' imprisonment, 5

years supervised release, no Fine or Restitution, and a Mandatory Special Assessment Fee of

$100.00. See Docs. 99, 102.

**B.**     **Statement of the Relevant Facts**

1.     Offense Conduct

The United States and Granados, through the advise of his counsel, agreed and stipulated

that the below factual proffer is a summary relating to his conduct:

> The investigation established that Luis Enrique Renteria Granados (Granados),
> Carlos Alberto Sinesterra Penalosa, Luis Rolando Bueno Jimenez, Nelson Alberto
> Penagos Molina, and Lisimaco Cortes Motta (Motta), were members of a
> Colombia-based drug trafficking organization (DTO) that transported multi-kilogram
> quantities of cocaine by self-propelled semisubmersible submarines from Colombia
> to Central America. Through an extensive Colombian wiretap investigation, and with
> the assistance of a cooperating source (CS) familiar with the DTO's activities,
> Colombian law enforcement authorities identified the voices of the defendants
> speaking during numerous lawfully-intercepted telephone conversations planning
> cocaine shipments for the DTO. The role of Granados was middleman between the
> source of the cocaine to be transported and the builders of the self-propelled
> semisubmersible submarines (SPSS). Each of the SPSS constructed had a capacity
> to carry at least three (3) tons of cocaine.
>
> On or about March 29, 2012, a United States marine patrol aircraft located and
> tracked a SPSS in international waters in the Caribbean Sea. After receiving
> permission from Honduran authorities, the United States Coast Guard (USCG)
> pursued the SPSS into the territorial waters of Honduras and attempted to interdict
> the SPSS. The USCG was able to video record the SPSS sinking and thereafter
> rescued four crewmembers on board. Because the SPSS was scuttled in 3,000 feet
> of water, no cargo was recovered. However, one crewmember informed law
> enforcement authorities that cocaine was loaded onto the SPSS prior to departing
> Colombia.
>
> On or about March 30, 2012, Colombian law enforcement intercepted a telephone
> call where Granados mentioned that the interdicted SPSS was close to arriving to its

4

intended destination in Honduras when the crew failed to follow instructions and problems ensued.

On or about July 26, 2012, Colombian law enforcement conducted surveillance in a remote jungle area of Necocli, Colombia, based on information obtained from the CS and intercepted telephone conversations. During this surveillance, DTO members became aware of the law enforcement authorities' presence and burned the SPSS.

On or about August 8 and 9, 2012, Colombian law enforcement authorities intercepted Granados and Motta expressing nervousness during a telephone conversation about what had happened and not wanting their participation to become known.

The involvement of Granados ceased because of rancor that developed as a result of the failed attempts.

See Doc. 68 at 1-2.

### 2.    Plea Proceeding

On December 8, 2016, a Change of Plea Hearing was held before Judge William P. Dimitrouleas. See Doc. 66. Granados pled guilty to the 1-count Indictment, pursuant to a written Plea Agreement. See Doc. 67. In exchange for Granados' guilty plea, the government agreed to: (1) recommend a three-level reduction in offense level for timely acceptance of responsibility, at sentencing; and (2) recommend an additional two-level decrease pursuant to § 2D1.1(b)(17). *Id.* at 3-5. The case was referred to the U.S. Probation Office for the preparation of the PSR.

### 3.    Presentence Report Calculations and Recommendations

The PSR prepared pursuant to the Court's Order calculated the defendant's advisory United States Sentencing Guidelines (USSG) range at 168 to 210 months' imprisonment based upon an adjusted Base Offense Level of 35 and a Criminal History Category of I. See PSR ¶ 92. Within the defendant's PSR his medical ailments were discussed:

Granados reported that in 1980, acid fell onto his left eye, and he lost all vision. He added that he is now losing vision in his right eye, and wears glasses.

5

Granados advised he suffers from fatty liver, and he may have prostate cancer. He informed he suffers from chronic stomach ulcers, hypertension, and tachycardia. The defendant stated that when he was younger, he suffered from tuberculosis. He added he has since been cured, but it affected his lungs. The defendant reported he takes prescription medication for his prostate, ulcers and cardiac condition.

See PSR ¶¶ 67-68.

### 4.   Sentencing Proceeding

On February 24, 2017, a Sentencing Hearing was held before Judge William P. Dimitrouleas. See Doc. 99. At sentencing, Granados' then defense counsel made an *ore tenus* motion for a downward variance this Court granted:

Defendant's age, medical situation and incomplete substantial assistance warrant a downward departure. A higher sentence is not required to promote respect for the law.

See Doc. 101. Based upon the favorable resolution of an objection made to the PSR and the granting of the downward variance motion, Granados was sentenced to the minimal statutory penalty permitted of 120 months' imprisonment. Additionally, a term of 5 years of supervised release was imposed.See Doc. 102. No direct appeal was filed in this case.

## III. DISCUSSION

As a preliminary matter, Granados respectfully requests that this Court be mindful that *pro se* complaints are to be held "to less stringent standards than formal pleadings drafted by lawyers," and should therefore be liberally construed. *Caldwell v. Warden,* 748 F.3d 1090 (11th Cir. 2014); *Estelle v. Gamble*, 429 U.S. 97 (1976)(same); and *Haines v. Kerner*, 404 U.S. 519 (1972)(same).

### A.   Federal Courts Have the Jurisdiction and Power to Reduce An Existing Sentence

This Court has the power to adjust Granados' sentence. District courts no longer need a motion from the Bureau of Prisons to resentence a federal prisoner under the compassionate release

provisions of 18 U.S.C. §3582(c)(1)(A)(i). A district court may now resentence if the inmate files

a motion after exhausting administrative remedies. The reasons that can justify resentencing are not

limited to medical, age, or family circumstances. A district court may resentence if the inmate

demonstrates extraordinary and compelling reasons for a sentence reduction. Such reasons are

present in this case.

### 1. Historical Framework

Congress first enacted the compassionate release provisions in 18 U.S.C. §3582 as part of

the Comprehensive Crime Control Act of 1984. That legislation provided that a district court could

modify a final term of imprisonment when extraordinary and compelling reasons warrant such a

reduction. 18 U.S.C. §3582(c)(1)(A)(i). In 1984, this provision was conditioned on the Bureau of

Prisons (BOP) filing a motion in the sentencing court. Absent a motion by the BOP, a sentencing

court had no jurisdiction to modify an inmate's sentence. Congress did not define what constitutes

an "extraordinary and compelling reason," but the legislative history recognized that the statute was

intended, in part, to abolish and replace federal parole. Rather than have the parole board review for

rehabilitation only, Congress authorized review for changed circumstances:

> The Committee believes that there may be unusual cases in which an eventual
> reduction in the length of a term of imprisonment is justified by changed
> circumstances. These would include cases of severe illness, cases in which other
> extraordinary and compelling circumstances justify a reduction of an unusually long
> sentence, and some cases in which the sentencing guidelines for the offense of which
> the defender was convicted have been later amended to provide a shorter term on
> imprisonment. S. Rep. No. 98-225 at 55-56 (1983).

18 U.S.C. §3582 acts as a "safety valve" for the "modification of sentences" that would

previously have been addressed through the former parole system. *Id*. at 121. The provision was

intended "to assure the availability of specific review and reduction of a term of imprisonment for

7

"extraordinary and compelling reasons" and [would allow courts] to respond to changes in the guidelines." *Id.* Thus, sentencing courts have the power to modify sentences for extraordinary and compelling reasons.

      2.      <u>Section 3582(c)(1)(A) is Not Limited To Medical, Elderly or Childcare Circumstances</u>

Congress initially delegated the responsibility for determining what constitutes "extraordinary and compelling reasons" to the United States Sentencing Commission. 28 U.S.C. § 994(t) ("The Commission…shall describe what should be considered "extraordinary and compelling reasons" for sentence reduction, including the criteria to be applied and a list of specific examples." Congress provided one limitation to that authority: "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Rehabilitation could, however, be considered with other reasons to justify a reduction.

In 2007, the Sentencing Commission defined "extraordinary and compelling reasons" as follows:

    (A)    Extraordinary and Compelling Reasons - Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the following circumstances:

        (i)     The defendant is suffering from a terminal illness.
        (ii)    The defendant is suffering from a permanent physical or medical condition, or is experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self care within the environment of a correctional facility and for which conventional treatment promises no substantial improvement.
        (iii)   The death or incapacitation of the defendant's only family member capable of caring for the defendant's minor child or minor children.
        (iv)   As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason for purposes of subdivision (1)(A). USSG §1B1.13, Application Note 1.

8

As we will see, with the passage of The First Step Act, subparagraph (iv) is no longer limited by what the BOP decides is extraordinary and compelling.

Historically, the BOP rarely filed motions under §3582(c)(1)(A), even when the inmates met the objective criteria for modification. See U.S. Dep't of Justice Office of the Inspector General, The Federal Bureau of Prisons Compassionate Release Program (Apr. 2013). The Office of the Inspector General also found that the BOP failed to provide adequate guidance to staff on the criteria for compassionate release, failed to set time lines for review of compassionate release requests, failed to create formal procedures for informing prisoners about compassionate release, and failed to generate a system for tracking compassionate release requests. *Id.* at i-iv.

Congress heard those complaints and in late 2018 enacted The First Step Act.

### 3.    The First Step Act

The First Step Act, P.L. 115-391, 132 Stat. 5194, at (Dec. 21, 2018), among other things, transformed the process for compassionate release. *Id.* at §603. Now, instead of depending upon the BOP to determine an inmate's eligibility for extraordinary and compelling reasons and the filing of a motion by the BOP, a court can resentence "upon motion of the defendant." A defendant can file an appropriate motion if the he or she has exhausted all administrative remedies or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. §3582(c)(1)(A). The purpose and effect of this provision is to give federal courts the ability to hear and resentence a defendant even in the absence of a BOP motion. Congress labeled this change "Increasing the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018). Senator Cardin noted in the record that the bill "expands compassionate release under the Second Chance Act and expedites compassionate release applications." 164 Cong.

R. 199 at S7774 (Dec. 18, 2018). In the House, Representative Nadler noted that the First Step Act includes "a number of very positive changes, such as … improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 Cong. R. H10346-04 (Dec. 20, 2018).

Once an inmate has pursued administrative remedies through the BOP, upon his or her motion, the sentencing court has jurisdiction and the authority to reduce a sentence if it finds "extraordinary and compelling reasons" to warrant a reduction. Judicial authority is no longer limited to cases that have the approval of the BOP.

<div align="center">4.     <u>Granados Has Exhausted Administrative Remedies</u></div>

A motion by an inmate can be filed in the district court after (1) the inmate has made the request to the Warden, and (2) either the request was denied or 30 days have lapsed from the receipt of the request, whichever is sooner. First Step Act of 2018, section 803(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018).

On February 6, 2020, Granados filed a request for compassionate release at Butner Low Federal Correctional Institution ("FCI Butner Low"). See Doc. 237 -4. Because the BOP failed to file a motion on Granados' behalf, exhaustion of administrative remedies is not an issue in this case. See 18 U.S.C. § 3582(c)(1)(A).

**B.**     **<u>Granados' Current Conditions of Confinement and Health Conditions</u>**

Granados, age 74, suffers from incurable, progressive disease, from which Granados will never recover, to wit: decreased vision, arterial hypertension, bilateral amblyopia, benign prostatic hyperthrophia, prostate specific antigen in crescendo, gastro-esophageal reflux disease, hidden aortic aneurysm, risk of prostate cancer, Type II diabetes mellitus, and arteriosclerosis heart disease. See Exhibit 1.

<div align="center">10</div>

**Facts:**

**_Pulmonary Hypertension_**. Pulmonary hypertension is a type of high blood pressure that affects the arteries in the lungs and the right side of the heart.

In one form of pulmonary hypertension, called pulmonary arterial hypertension (PAH), blood vessels in the lungs are narrowed, blocked or destroyed. The damage slows blood flow through the lungs, and blood pressure in the lung arteries rises. The heart must work harder to pump blood through the lungs. The extra effort eventually causes the heart muscle to become weak and fail.

In some people, pulmonary hypertension slowly gets worse and can be life-threatening. Although there's no cure for some types of pulmonary hypertension, treatment can help reduce symptoms and improve quality of life.

**Complications**
Potential complications of pulmonary hypertension include:
- Right-sided heart enlargement and heart failure (cor pulmonale). In cor pulmonale, the heart's right lower chamber (ventricle) becomes enlarged. It has to pump harder than usual to move blood through narrowed or blocked pulmonary arteries.
  As a result, the heart walls thicken and the right ventricle expands to increase the amount of blood it can hold. But these changes create more strain on the heart, and eventually the right ventricle fails.
- Blood clots. Having pulmonary hypertension increases the risk of blood clots in the small arteries in the lungs.
- Irregular heartbeats (arrhythmias). Certain arrhythmias caused by pulmonary hypertension can be life-threatening.
- Bleeding in the lungs. Pulmonary hypertension can lead to life-threatening bleeding into the lungs and coughing up blood (hemoptysis).

**_Diabetes_**. Diabetes is a serious condition that causes higher than normal blood sugar levels. Diabetes occurs when your body cannot make or effectively use its own insulin, a hormone made by special cells in the pancreas called islets (eye-lets). Insulin serves as a "key" to open your cells, to allow the sugar (glucose) from the food you eat to enter. Then, your body uses that glucose for energy.

But with diabetes, several major things can go wrong to cause diabetes. Type 1 and type 2 diabetes are the most common forms of the disease, but there are also other kinds, such as gestational diabetes, which occurs during pregnancy, as well as other forms.

**_Arteriosclerosis_**. Arteriosclerosis occurs when the blood vessels that carry oxygen and nutrients from your heart to the rest of your body (arteries) become thick and stiff — sometimes restricting blood flow to your organs and tissues. Healthy arteries are flexible and

elastic, but over time, the walls in your arteries can harden, a condition commonly called hardening of the arteries.

Atherosclerosis is a specific type of arteriosclerosis. Atherosclerosis is the buildup of fats, cholesterol and other substances in and on your artery walls. This buildup is called plaque. The plaque can cause your arteries to narrow, blocking blood flow. The plaque can also burst, leading to a blood clot.

**Complications**

The complications of atherosclerosis depend on which arteries are blocked. For example:

- Coronary artery disease. When atherosclerosis narrows the arteries close to your heart, you may develop coronary artery disease, which can cause chest pain (angina), a heart attack or heart failure.
- Carotid artery disease. When atherosclerosis narrows the arteries close to your brain, you may develop carotid artery disease, which can cause a transient ischemic attack (TIA) or stroke.
- Peripheral artery disease. When atherosclerosis narrows the arteries in your arms or legs, you may develop circulation problems in your arms and legs called peripheral artery disease. This can make you less sensitive to heat and cold, increasing your risk of burns or frostbite. In rare cases, poor circulation in your arms or legs can cause tissue death (gangrene).
- Aneurysms. Atherosclerosis can also cause aneurysms, a serious complication that can occur anywhere in your body. An aneurysm is a bulge in the wall of your artery. Most people with aneurysms have no symptoms. Pain and throbbing in the area of an aneurysm may occur and is a medical emergency.
  If an aneurysm bursts, you may face life-threatening internal bleeding. Although this is usually a sudden, catastrophic event, a slow leak is possible. If a blood clot within an aneurysm dislodges, it may block an artery at some distant point.
- Chronic kidney disease. Atherosclerosis can cause the arteries leading to your kidneys to narrow, preventing oxygenated blood from reaching them. Over time, this can affect your kidney function, keeping waste from exiting your body.

**_COVID-19_**. COVID-19 is the disease caused by the new coronavirus that emerged in China in December 2019. COVID-19 symptoms include cough, fever or chills, shortness of breath or difficulty breathing, muscle or body aches, sore throat, new loss of taste or smell, diarrhea, headache, new fatigue, nausea or vomiting and congestion or runny nose. COVID-19 can be severe, and some cases have caused death.

COVID-19 has infected hundreds of prisoners and staff in city jails, state prisons and federal prisons.

New York, California and Ohio were among the first to release incarcerated people. Other states have followed, saying it is the only way to protect prisoners, correctional workers, their families and the broader community.

Jails and prisons often lack basic hygiene products, have minimal health care services and are overcrowded. Social distancing is nearly impossible except in solitary confinement, but that poses its own dangers to mental and physical health.

While there is absolutely no evidence to support that any person is more or less likely to be infected [with COVID-19] based on existing medical conditions, Granados' argues that, first, prisoners experience exponentially higher rates of COVID-19 than the general population. As of June 2020, "[t]he COVID-19 case rate for prisoners was 5.5 times higher than the US population case rate."[2] Second, and more critically, older individuals and individuals with chronic medical conditions are at greater risk of hospitalization and death from COVID-19. For example, the CDC reports that persons aged 40 to 49 are 15 times more likely to be hospitalized and 130 times more likely to die from COVID-19 compared to persons aged 18 to 29 and younger.[3] In other words, Granados does not only contend that his health conditions increase his risk of getting COVID-19; but also, he contends that those conditions greatly increase the risk that, if contracted, his COVID-19 infection would be severe or even deadly.

_____

[2]

Brendan Saloner, *et al.*, *COVID-19 Cases and Deaths in Federal and State Prisons*, J. of the Am. Med. Ass'n (July 8, 2020), https://jamanetwork.com/journals/jama/fullarticle/2768249.

[3]

*Hospitalizations & Death by Age*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html (last updated May 14, 2021).

*BOP Amid Covid-19*

One consequence of overcrowding is that prison officials have a difficult time providing adequate health care.

In 2011 the U.S. Supreme Court ruled that overcrowding undermined health care in California's prisons, causing avoidable deaths. The justices upheld a lower court's finding that this caused an "unconscionable degree of suffering" in violation of the Eighth Amendment's prohibition on cruel and unusual punishment.

Amid a worldwide pandemic, such conditions are treacherous. Some of the worst COVID-19 outbreaks in U.S. prisons and jails are in places – like Louisiana and Chicago – whose prison health systems have been ruled unconstitutionally inadequate. Criminologists and advocates say many more people should be released from jails and prison, even some convicted of violent crimes if they have underlying health conditions.

The decision to release prisoners cannot be made lightly. But arguments against it discount a reality recognized over two centuries ago: The health of prisoners and communities are inextricably linked. Coronavirus confirms that prison walls do not, in fact, separate the welfare of those on the inside from those on the outside.

## C.   Granados Has "Extraordinary and Compelling Reasons" For Compassionate Release

The principles of Compassionate Release allow for Granados' early release. As discussed above, the principles for release are no longer limited to BOP guidelines; federal courts have the power to determine what constitutes extraordinary and compelling circumstances.

### 1.   COVID-19 Is a Public Health Disaster That Threatens Vulnerable Incarcerated Persons like Granados.

14

The COVID-19 pandemic continues to roil the United States. As of April 21, 2022, the BOP has 136,882 federal inmates in BOP-managed institutions and 13,370 in community-based facilities. The BOP staff complement is approximately 36,000. There are 57 federal inmates and 150 BOP staff who have confirmed positive test results for COVID-19 nationwide. There have been 293 federal inmate deaths and 7 BOP staff member deaths attributed to COVID-19 disease. See https://www.bop.gov/coronavirus/ (last accessed April 21, 2022). Bottom line, Federal facilities are not immune.

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19. Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons. Inmates share small cells, eat together and use the same bathrooms and sinks. . . . . They are not given tissues or sufficient hygiene supplies"); Joseph A. Bick (2007). *Infection Control in Jails and Prisons*. Clinical Infectious Diseases 45(8):1047-1055, at https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"). BOP employees are complaining that they lack masks and gloves, hand sanitizer, and even soap.

"The [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . . We don't know who's infected." *Manrique*, 2020 WL 1307109, at *1.10

15

Indeed, as the Second Circuit recently observed, present information about the COVID-19

epidemic and the BOPs' prior failings in 2019 to adequately protect detainees and allow them access

to counsel and their families following a fire and power outages suggest that the virus' impact will

likely be "grave and enduring." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778,

2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

> 2. <u>Granados' Vulnerability to COVID-19 Due to His High Medical Risk Is an Extraordinary and Compelling Reason That Warrants a Sentence Reduction.</u>

Granados is particularly vulnerable to COVID-19 because of his hypertension,

arteriosclerosis heart disease, and diabetes. At the time of sentencing, the Court could not have

anticipated that Granados' diseases will place him in the "high risk" category nor the existence of

the COVID-19. As the COVID-19 pandemic continues, it potentially poses a particular issue for

older people and people with pre-existing medical conditions (such as serious heart condition, lung

disease, and autoimmune disease) appear to be more vulnerable to becoming severely ill with the

COVID-19 virus.

> *Lung Problems, Including Asthma*
> COVID-19 targets the lungs, so you're more likely to develop severe symptoms if you have preexisting lung problems, such as: Moderate to severe asthma, Chronic obstructive pulmonary disease (COPD), Lung cancer, Cystic fibrosis, Pulmonary fibrosis. In addition to being an asthma trigger, smoking or vaping can harm your lungs and inhibit your immune system, which increases the risk of serious complications with COVID-19.

> *Heart Disease, Diabetes and Obesity*
> People with diabetes, heart disease, high blood pressure or severe obesity are more likely to experience dangerous symptoms if infected with COVID-19. This may be of particular concern in the United States, which has seen increasing rates of obesity and diabetes over the years.

Obesity and diabetes both reduce the efficiency of a person's immune system. Diabetes increases the risk of infections in general. This risk can be reduced by keeping blood sugar levels controlled and continuing your diabetes medications and insulin. Your risk of serious illness may also be higher if you have heart diseases such as cardiomyopathy, pulmonary hypertension, congenital heart disease, heart failure or coronary artery disease.

### How SARS-COV-2 Causes Disease and Death in COVID-19

"You'd expect underlying lung problems or immune system problems will be the greatest risk," says Dr. Levitt. "But it seems the biggest risk factors have been hypertension, diabetes and obesity." That has led many scientists to suspect that the profound inflammation seen in severe cases of COVID-19 may be yet another problem linked to SARS-COV-2's fondness for ACE2. People with diabetes, hypertension and heart disease have more ACE2 on their cells as a response to the higher levels of inflammation that come with their condition; ACE2 has an anti-inflammatory effect. When SARS-COV-2 sticks to ACE2 and reduces its ability to do its job, the underlying inflammation gets worse.

When inflammation gets completely out of control the body enters what is called a cytokine storm. Such storms drive the most severe outcomes for COVID-19, including multi-organ failure. There is thus an obvious role for anti-inflammatory drugs. But knowing when to administer them is hard. Go too late, and the storm will be unstoppable; go too early, and you may dampen down an immune response that is turning the tide. A recent article in the Lancet suggests that it would help if COVID-19 patients were routinely screened for hyper-inflammation to help identify those who might benefit from anti-inflammatory drugs. But not everyone is convinced today's drugs have much to offer. "We tried [a range of anti-inflammatory treatment] and it actually didn't work," says Rajnish Jaiswal, who has been working on the front line of COVID-19 treatment at New York's Metropolitan Hospital.

https://www.economist.com/briefing/2020/06/06/how-sars-cov-2-causes-disease-and-death-in-covid-19.

### Delta Plus Variant of COVID-19

The latest coronavirus variant has spread to about a dozen countries—including India, the U.S., and the U.K.—while scientists scramble to figure out if the strain is more deadly or transmissible.

A new variant of the coronavirus has emerged, and scientists are working to figure out if it is more dangerous than its infamous cousin, the Delta variant, which has killed hundreds of thousands of people in India and is fast becoming the dominant variant around the world.

17

The state of Maharashtra, India, which was hit hard by the devastating second wave of COVID-19, has now reimposed lockdowns due to rising fears about this new variant, dubbed Delta Plus (which is not an official designation).

Delta Plus differs just slightly from Delta—the predominant strain in India and the United Kingdom—which is more infectious and is thought to cause more hospitalizations than previous strains. Existing vaccines are effective against Delta, but only when people are fully vaccinated.

See https://www.nationalgeographic.com/science/article/how-dangerous-is-the-new-delta-plus-variant--heres-what-we-know.

The dangerous Delta variant of the coronavirus is spreading so quickly in the United States that it's likely the mutant strain will become predominant in the nation within weeks, according to federal health officials and a new analysis.

At a White House briefing on COVID-19 on Tuesday, Dr. Anthony Fauci of the National Institutes of Health said 20.6% of new cases in the U.S. are due to the Delta variant. And other scientists tracking the variant say it is on track to become the dominant virus variant in the U.S.

"The Delta variant is currently the greatest threat in the U.S. to our attempt to eliminate COVID-19," Fauci said. He noted that the proportion of infections being caused by the variant is doubling every two weeks.

The variant, first identified in India, is the most contagious yet and, among those not yet vaccinated, may trigger serious illness in more people than other variants do, he said.

See https://www.npr.org/sections/health-shots/2021/06/22/1008859705/delta-variant-coronavirus-unvaccinated-u-s-covid-surge.

Due to overcrowding, lack of resources, and little access to medical care, incarcerated people have been at high risk for contracting COVID-19. Now, as the highly transmissible Delta variant circulates widely, they may be even more susceptible to the virus.

***Josh Manson***, a researcher at the UCLA Law COVID Behind Bars Data Project, tells Verywell that there have been few efforts to curb the Delta variant and COVID-19 overall, making prisons deadly places for transmission. "When the pandemic first hit in March 2020, prisons were

18

not taking the situation seriously," Manson says. "We know that it's even more transmissible than it was the first time a year and a half ago. We've seen thousands of people die in jails and prisons."

So far, at least 2,718 people incarcerated in state and federal prisons, including ICE custody, have died of COVID-19, making prisons a lethal setting during the pandemic.[4]

According to Manson, the current death count is an underestimate. "There's evidence emerging that the counts that have been recorded are actually undercounted," Manson explains. "So we don't even know the true totals of how many people died."

*For Prisoners, Vaccine Trial Participation May Do More Harm Than Good*

Early on, the Centers for Disease Control and Prevention (CDC) identified people in prison as vulnerable to COVID-19 infection. At the height of the pandemic, public health practitioners and civil rights organizations demanded the release of people in prison due to overcrowding and the lack of access to medical care.[5]

According to the Prison Policy Initiative, the Federal Bureau of Prisons released over 24,000 people over the course of the pandemic, with sentences to be served in home confinement.[6]

While some prisoners were released, a portion of the releases were deathbed releases—or the release of incarcerated individuals who are near death.

*Delta Variant Is Creating a Web of Regional COVID-19 Epidemics*
"It's basically just taking the handcuffs off while they're [incarcerated people] on a ventilator and then saying, 'oh, you're free,' and then they die," Manson explains.

Deathbed releases have made it difficult to determine the number of deaths that occurred within prisons, Manson adds. In fact, the New York Times reported this

---

[4]

UCLA Law COVID Behind Bars Data Project. National aggregate counts. Updated July 6, 2021.

[5]

ACLU. ACLU demands the release from prisons and jails of communities vulnerable to COVID-19. Updated March 18, 2020.

[6]

Prison Policy Initiative. The most significant criminal justice policy changes from the COVID-19 pandemic. Updated May 18, 2021.

week that dozens of these cases around the country have been excluded from official counts.

### Collecting COVID-19 Data From Prisons Remains Challenging
Data collection within prisons has been no easy feat, according to Manson.

**Homer Venters, MD**, epidemiologist, clinical associate professor at New York University's College of Global Public Health, and former chief medical officer for the New York City jail system, tells Verywell that to track and promote better health outcomes, he believes data should be collected by the CDC and state departments of health.

"Some of the recommendations that I really advocated for in the Biden White task force have explicitly called on the CDC and the state department's of health to become much more involved in tracking health outcomes," Venters says.

### Study: COVID-19 Crowdfunding Campaigns Benefited Privileged Groups Most
"All health data from prisons right now is really all over the place," Manson adds.

For example, prison systems report vaccination differently. Some prisons have reported the number of incarcerated people who have received only the first dose, while other systems have reported the number of staff and incarcerated people who received both doses.

### Vaccination Rates for Staff Lags Behind
Manson says that vaccine efforts within prisons aren't as robust as they should be. While 446,079 incarcerated individuals (or 66%) have received at least one dose of the COVID-19 vaccine, carceral facility staff are vaccinated at much lower rates.

Across all U.S. prisons, only 110,946 correctional staff (45%) have been vaccinated in comparison.[7] Venters says that low vaccination rates among carceral staff are a national problem.

"You'll see that the vaccination rate for incarcerated people is higher than for staff," Manson says. "That is not because incarcerated people have had easier access, but because staff refusal rates have been high." Because the Delta variant is highly transmissible, staff can serve as transmitters of the virus if they are unvaccinated.

"When you have such an overcrowded facility, which these facilities are right now, it only takes one case," Manson says. "So if a member is not vaccinated, they can very easily transmit the virus."

---

[7]

UCLA Law COVID Behind Bars Data Project. COVID-19 vaccines in carceral facilities. Updated 2021.

*Experts Say More Needs to Be Done to Curb Hesitancy*
According to Venters, the most basic strategies for curbing vaccine hesitancy—like addressing people's concerns about safety—are not being employed.

Incarcerated people have declined vaccinations because their questions about the vaccines were left unanswered, Venters says.

"Often behind bars, the way that the vaccine is offered is through these big mass events, there's very little attention to finding the people who have questions, and really sitting down and talking to them," Venters adds.

*Pfizer and Moderna COVID-19 Vaccines Could Produce Years of Immunity*
These questions typically arise for people in prison who have complicated health problems. "We have this paradoxical situation where some of the sickest people who really just had a lot of normal, genuine questions about vaccinations remain unvaccinated because of the way in which the vaccine has been offered," Venters stresses.

For correctional officers, some have rejected the vaccine because they were worried about not having enough paid time off, Venters notes.

"Correctional settings decided they were going to give people five or 10 days of COVID off, and that would include if they got sick from COVID, or if they had a side effect of the vaccine," he adds. "But many correctional officers blew through that time a year ago when they got sick."

*WHO Urges Fully Vaccinated People to Wear Masks Due to Delta Variant Spread*
Correctional officers expressed worry to Venters that if they experienced side effects, they wouldn't have any sick time, underscoring the financial concerns for carceral staff and their families. This suggests a need for policy change within the prison system, Venters says.

Regardless of a vaccine mandate, curbing the Delta variant will require engaging with carceral staff.

Hence, it is appropriate for Granados to be released into an environment where he and his loved ones can control and direct his medical care. It is important for all of us to remember that convicted criminals are sent to prison as punishment—not for punishment. People who are severely debilitated or are in the midst of dying are usually no longer a threat to society, and there is not a compelling social advantage to keeping them in prison.

21

**Note:** According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 is a new disease and there is limited information regarding risk factors for severe disease. Based on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19.

a. Based on what we know now, those at high-risk for severe illness from COVID-19 are:
- People 60 years and older
- People who live in a nursing home or long-term care facility

b. People of all ages with underlying medical conditions, particularly if not well controlled, including:
- Cancer
- Chronic kidney disease
- Chronic lung diseases, including COPD (chronic obstructive pulmonary disease), asthma (moderate-to-severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension
- Dementia or other neurological conditions
- Diabetes (type 1 or type 2)
- Down syndrome
- Heart conditions (such as heart failure, coronary artery disease, cardiomyopathies or hypertension)
- HIV infection
- Immunocompromised state (weakened immune system)
- Liver disease
- Overweight and obesity
- Pregnancy
- Sickle cell disease or thalassemia
- Smoking, current or former
- Solid organ or blood stem cell transplant
- Stroke or cerebrovascular disease, which affects blood flow to the brain
- Substance use disorders

are the hallmark of those who are most endangered by the instant pandemic. These are "extraordinary and compelling reasons" for his release. See Note 1(A), § 1B1.13 (expressly recognizing that "other reasons" may exist for granting compassionate release), see Note 1(D), § 1B1.13 Note 1(D) (recognizing that extraordinary and compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C)."). Here, Granados' high susceptibility to

COVID-19 falls within the purview of this catchall. Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there. Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the inability in a facility like BOP to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that Granados suffers from ailments that have already been identified as "high risk," this Court should find that Granados' legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

A recent letter by fourteen U.S. senators of both parties underscores this position. Writing to U.S. Attorney General William Barr and BOP Director Michael Carvajal, they stated: "[We] urge you to take necessary steps to protect [inmates in Federal custody] particularly by using existing authorities under the First Step Act (FSA). . . . We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to protect the most vulnerable staff and inmates. . . . [I]t is important . . . that the most vulnerable inmates are released or transferred to home confinement, if possible." And as the Second Circuit noted about COVID-19 in a unanimous recent opinion, "The impact of this recent emergency on jail and prison inmates, their counsel . . . , the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present information strongly suggests, however, that it may be grave and enduring." *Fed. Defs. of New York, Inc.*, 2020 WL 1320886, at *12.

23

Finally, in the last few months, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the incarcerated population and thus reduce the risk of spread. For example, on March 25, 2020, New York City announced that it would release 300 inmates from Rikers Island. Approximately 1,700 inmates have been released from Los Angeles County Jails, and 1,000 inmates are to be released from New Jersey jails. Therefore, while COVID-19 remains an unprecedented emergency, many states (and politicians) have recognized that they have a duty to flatten the curve inside incarcerated spaces. So, too, should this Court.

3.   Courts Have Granted Compassionate Release in Light of the Instant Pandemic.

Courts around the country have granted compassionate release where the defendant suffers from a serious condition that increases the likelihood of severe consequences from COVID-19. *See, e.g., United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020) (hypertension, prediabetes, prostate issues, bladder issues, and a dental infection); *United States v. Bess*, No. 16-cr-156, 2020 WL 1940809, at *8 (W.D.N.Y. Apr. 22, 2020) (congestive heart failure, coronary artery disease, diabetes, and hypertension); *United States v. Zukerman*, No. 16 Cr. 194 (AT), 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020) (diabetes, hypertension, and obesity); *United States v. Williams*, No. 3:04cr95/MCR, 2020 WL 1751545, at *3 (N.D. Fla. Apr. 1, 2020) (coronary disease, peripheral vascular disease, congestive heart failure, end-stage renal disease, hyperlipidemia, and prediabetes); *United States v. Watkins*, Case No. 15-20333 (E.D. Mich. Jul. 16, 2020), granting compassionate release to prisoner whose only underlying condition was previously-treated latent TB; and *Singh v. Barr*, No. 20-CV-02346-VKD, 2020 WL 1929366, at *10

24

(N.D. Cal. Apr. 20, 2020) (granting release from immigration custody for petitioner with latent TB, hypertension, and obesity); and *United States v. Gerard Scparta*, No. 18 Cr. 578 (AJN), ECF Dkt. 69 (S.D.N.Y. Apr. 19, 2020). In *Scparta,* Judge Nathan granted a compassionate release motion of a 55-year old defendant who suffers from high blood pressure, high cholesterol, sleep apnea, and hypertension. The court found that it could waive § 3582(c)(1)(A)'s 30-day waiting period and hear the motion, and describes FCI Butner's "Kafkaesque" "14-day quarantine" process—which is neither a true "quarantine" nor actually limited to 14 days—before releasing inmates to home confinement.

### 4.    Granados' Remarkable Rehabilitation

It is essential to also note that since Granados' incarceration began, he has taken numerous steps to attempt to improve himself in "post-conviction rehabilitation." See Exhibit 2. Throughout the time he has spent in prison, Granados has worked long and hard and diligently at his rehabilitation. Hence, there can be no genuine safety concerns on his release. His extraordinary rehabilitation shows that he is ready for re-entry.

Granados urges the Court to consider the following *Redd* case citations:

- *United States v. Carpenter*, 2:14-CR-00309-TLN, 2020 WL 5851129 (E.D. Cal. Sept. 30, 2020) in which the court initially denied the defendant's request for compassionate release but later granted on a motion for reconsideration after observing that cases within defendant's facility had increased and that the defendant was herself diagnosed with COVID-19.

- *United States v. Belanger*, 1:15-CR-00072-JDL, 2020 WL 5351028 (D. Me. Sept. 4, 2020), which granted release for a defendant at risk of severe COVID after he had served approximately 30% of a 132-month sentence.

- *United States v. Grant*, 16-30021-001, 2020 WL 4036382 (C.D. Ill. July 17, 2020) which specifically recognized that osteomyelitis may pose a serious health risk despite not being specifically named by the CDC as a COVID-19 risk factor.

25

- *United States v. Pabon*, 458 F. Supp. 3d 296, 299 (E.D. Pa. 2020) which granted defendant compassionate release after serving 14 months of a 46-month sentence because "continued incarceration might interfere with his ability to get needed medical care" for hypertension, diabetes, and other medical conditions.

And

- *United States v. Crowe*, 980 F.3d at 1102 n.6 (holding that inmate's prior exposure to tuberculosis "could be considered an extraordinary and compelling reason for compassionate release" because it "put him at risk of contracting the virus" or "serious long-term health problems" if he had already contracted it). Courts considering the issue post-*Jones* have agreed. See, e.g., *United States v. Rucker*, No. 17-20716, 2020 WL 7240900, at *2 (E.D. Mich. Dec. 9, 2020) (HIV and asthma) (citing *Jones*, 980 F.3d at 1102 n.6); *United States v. White*, No. 18-20183, 2020 WL 7240904, at *3 (E.D. Mich. Dec. 9, 2020) (BMI of 45.9) (citing *Jones*, 980 F.3d at 1102 n.6); *United States v. Crowe*, No. CR 11-20481, 2020 WL 7185648, at *3 (E.D. Mich. Dec. 7, 2020) (latent tuberculosis, hyperlipidemia, obesity).

- Section 1B1.13 has not been updated to reflect pursuant to the 2018 First Step Act, hence, defendants now have the ability to bring such motions directly. This anomaly has given rise to a debate concerning whether and to what extent § 1B1.13 applies to motions filed by defendants, with several circuits recently holding that § 1B1.13 applies only to motions filed by the Bureau of Prisons, and not to motions filed by defendants on their own behalf. See *United States v. McCoy*, Nos. 20-6821, 20-6869, 20-6875, 20-6877, 2020 WL 7050097, at *6-7 (4th Cir. Dec. 2, 2020); *United States v. Jones*, No. 20-3701, 2020 WL 6817488, at *8-9 (6th Cir. Nov. 20, 2020); *United States v. Gunn*, No. 20-1959, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020); *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020).

Factoring in Granados' rehabilitation and impeccable conduct in prison, his continued risk to the public if released appears to be markedly reduced as recidivism declines with age, particularly when tempered by significant rehabilitation. Given the length of his imprisonment, his personal rehabilitation, and deeply felt remorse, the Court must conclude that deterrence and public protection are no longer strong § 3553(a) factors weighing in favor of continued detention.

26

Under 18 U.S.C. § 3582(c)(2), to modify Granados' sentence, taking into account the advisory nature of the guidelines after *Booker* and the considerations set forth in 18 U.S.C. § 3553(a). The court should find that a sentence of time served is sufficient, but not greater than necessary, and accounts for the sentencing factors the court must consider pursuant to 18 U.S.C. § 3553(a), specifically deterrence, protection of the public, and respect for the law.

Additionally, Granados also contends that evidence of his post-sentencing rehabilitation warrants a reduction. More so, his BOP record does not show that he is violent or a threat to public safety.

Finally, the combination of factors, age, health conditions, COVID-19 risk, as well as length of time already served, post-sentencing rehabilitation, and the changing sentencing landscape justify granting compassionate release to Granados. More so, his BOP record does not show that he is violent or a threat to public safety.

## IV. <u>CONCLUSION</u>

For the above and foregoing reasons, Granados prays this Court would consider his Motion for Compassionate Release/ Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018, based upon the fact that he has exhausted available administrative remedy and he has met the "extraordinary and compelling reasons" requirement.

Respectfully submitted,

Dated: April 29, 2022

_____
LUIS ENRIQUE RENTERIA-GRANADOS
REG. NO. 09485-104
FCI BUTNER LOW
FEDERAL CORR. INSTITUTION
P.O. BOX 999
BUTNER, NC  27509
Appearing *Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2022, I mailed a true and correct copy of the above and foregoing Motion for Compassionate Release/Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018 via U.S. Mail, postage prepaid, to Donald F. Chase, II, Assistant U.S. Attorney at U.S. Attorney's Office, 500 E Broward Boulevard, 7th Floor, Fort Lauderdale, FL 33394.

_____
LUIS ENRIQUE RENTERIA-GRANADOS

28

**<u>EXHIBIT 1:</u>**
**"Medical Documents"**

**Bureau of Prisons**
**Health Services**
**Cosign/Review**

| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | | | Reg #: | 09485-104 |
|---|---|---|---|---|---|
| Date of Birth: | 09/21/1947 | Sex: | M | Race: | BLACK |
| Encounter Date: | 09/29/2021 13:21 | Provider: | Lab Result Receive | Facility: | BUF |

**Reviewed by Meyer, Caleb APRN-CNP on 10/04/2021 08:06.**

# Bureau of Prisons
## Health Services
### Clinical Encounter

| | | | | |
|---|---|---|---|---|
| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | | Reg #: | 09485-104 |
| Date of Birth: | 09/21/1947 | Sex: M  Race: BLACK | Facility: | BUF |
| Encounter Date: | 08/20/2021 09:01 | Provider: Meyer, Caleb APRN-CNP | Unit: | V05 |

Mid Level Provider - Follow up Visit encounter performed at Health Services.

**SUBJECTIVE:**

COMPLAINT 1      Provider:  Meyer, Caleb APRN-CNP

Chief Complaint:   No Complaint(s)

Subjective:    New medication cipro dispensed.  Advised to stop previous antibiotic and start the cipro today.
Patient verbalizes understanding.

Pain:         No

**OBJECTIVE:**

**Exam:**

**General**

**Appearance**

Yes: Appears Well, Alert and Oriented x 3

No: Appears Distressed

**ASSESSMENT:**

Urinary tract infection, site not specified, N390 - Current

**PLAN:**

Disposition:

Follow-up at Sick Call as Needed

Follow-up at Chronic Care Clinic as Needed

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 08/20/2021 | Counseling | Access to Care | Meyer, Caleb | Verbalizes Understanding |
| 08/20/2021 | Counseling | New Medication | Meyer, Caleb | Verbalizes Understanding |
| | discussed cipro risk and benefits. | | | |

**Copay Required:** No          **Cosign Required:** No

**Telephone/Verbal Order:** No

Completed by Meyer, Caleb APRN-CNP on 08/20/2021 09:03

# Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

| | | | | | | |
|---|---|---|---|---|---|---|
| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | | | | Reg #: | 09485-104 |
| Date of Birth: | 09/21/1947 | | Sex: | M    Race: BLACK | Facility: | BUF |
| Note Date: | 08/19/2021 09:50 | | Provider: | Firozvi, Amir M.D. | Unit: | V05 |

Cosign Note - Lab Report Cosign encounter performed at Health Services.
**Administrative Notes:**

   ADMINISTRATIVE NOTE   **1**        Provider:   Firozvi, Amir M.D.

   PT on bactrim for uti since 8/10,  8/16 Cxs grew Ecoli resistant to Bactrim, but sensitive to Cipro. Will write for cipro for 10-14 days.

**New Medication Orders:**

| Rx# | Medication | Order Date |
|---|---|---|
| | Ciprofloxacin Tablet | 08/19/2021 09:50 |

   **Prescriber Order:**        500mg  Orally  -  Two Times a Day x 10 day(s) -- First dose ASAP

   Indication:   Urinary tract infection, site not specified

**Copay Required:** No          **Cosign Required:**  No
**Telephone/Verbal Order:**  No

Completed by Firozvi, Amir M.D. on 08/19/2021 09:59
Requested to be reviewed by  Meyer, Caleb APRN-CNP.

Review documentation will be displayed on the following page.

| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | | | Reg #: | 09485-104 |
|---|---|---|---|---|---|
| Date of Birth: | 09/21/1947 | Sex: | M   Race:   BLACK | Facility: | BUF |
| Encounter Date: | 08/10/2021 08:14 | Provider: | Valdez, Michael MD | Unit: | V05 |

**Exam:**

**Mouth**

**General**

No: Lesions

**ASSESSMENT:**

Acute respiratory distress syndrome, J80 - Current

Enlarged prostate without lower urinary tract symptoms (BPH), N400 - Current

Essential (primary) hypertension, I10 - Current

Gastro-esophageal reflux disease without esophagitis, K219 - Current

Hyperlipidemia, unspecified, E785 - Current

Unspecified disorder of vitreous body, H439 - Current

**PLAN:**

**Disposition:**

Discharged to Housing Unit with Convalescence

Follow-up at Sick Call as Needed

Follow-up at Chronic Care Clinic as Needed

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 08/10/2021 | Counseling | Access to Care | Valdez, Michael | Attentive |

**Copay Required:** No          **Cosign Required:**  No

**Telephone/Verbal Order:**   No

Completed by Valdez, Michael MD on 08/10/2021 08:21

# Bureau of Prisons
## Health Services
## Clinical Encounter

| | | | |
|---|---|---|---|
| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | Reg #: | 09485-104 |
| Date of Birth: | 09/21/1947 | Sex: M Race: BLACK | Facility: BUF |
| Encounter Date: | 08/10/2021 07:42 | Provider: Valdez, Michael MD | Unit: V05 |

Chronic Care - Chronic Care Clinic encounter performed at Health Services.

**SUBJECTIVE:**

COMPLAINT 1     Provider: Valdez, Michael MD

Chief Complaint: Chronic Care Clinic

Subjective: 73 y/o male comes to chronic care clinic for follow up. In the interim he remains compliant with current medical treatment plan. He is at usual baseline health able to ambulate eat and drink po as usual. He is able to complete all adls and has no acute systemic complaint: no cp no sob no fever no abd pain no nvd no cough.

1. Hypertension: cont ccb asa; increase losartan to 100mg daily due elevated bp today
2. GeRD: egd 7'18- non-erosive gerd. Cont omeprazole 40mg.
3. BPH: Hx of elevated psa since 2017,s/p turp 8/2017 in Miami, biopsy reported neg for Malignancy: cont tamsulosin , followed by gu for luts with recs for cystoscopy pending scheduling..will send for ua to further evaluate as he has complaints of symptomatic uti and empirically tx with bactrim
4. Pulm nodules on ct chest: Hx of LTBI s/p tx. CT chest/abd/pelvis (3/7/19): stable 4mm left pulm nodule.
5. Hld. low chol diet and doing regular exercises. Cont statin; monitor lipids lft

HM:
Psa: ordered
Gi: colonoscopy 2018
Cxr in chart 2018
Ekg in chart 2020
Optho: consult ordered
Immunization: flu vax uptd pneumo2018 tdap 2018; covid vax x2 2021

Pain: No

**Seen for clinic(s):** Hypertension

**OBJECTIVE:**

**Temperature:**

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 08/10/2021 | 09:38 BUX | 98.7 | 37.1 | | Valdez, Michael MD |

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 08/10/2021 | 09:38 BUX | 80 | | | Valdez, Michael MD |

**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 08/10/2021 | 09:38 BUX | 16 | Valdez, Michael MD |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 08/10/2021 | 09:38 BUX | 150/88 | | | | Valdez, Michael MD |

**Weight:**

| Date | Time | Lbs | Kg | Waist Circum. | Provider |
|---|---|---|---|---|---|

| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | | | Reg #: | 09485-104 |
|---|---|---|---|---|---|
| Date of Birth: | 09/21/1947 | Sex: | M   Race: BLACK | Facility: | BUF |
| Encounter Date: | 08/10/2021 07:42 | Provider: | Valdez, Michael MD | Unit: | V05 |

| Date | Time | Lbs | Kg | Waist Circum. | Provider |
|---|---|---|---|---|---|
| 08/10/2021 | 09:38 BUX | 220.0 | 99.8 | | Valdez, Michael MD |

**Exam:**

**General**

  **Affect**

    Yes: Pleasant, Cooperative

    No: Irritable, Agitated, Flat, Anxious

  **Appearance**

    Yes: Appears Well, Alert and Oriented x 3

    No: Appears Distressed

  **Nutrition**

    Yes: Within Normal Limits, Adequate food intake

    No: Poor food intake

**Skin**

  **General**

    Yes: Within Normal Limits, Dry, Skin Intact

    No: Warmth, Clammy, Cool, Diaphoretic

  **Wound**

    No: Wounds present

  **Lesions**

    No: Present

  **Operative Incision**

    No: Approximated, Open wound

  **Color**

    Yes: Within Normal Limits

    No: Cyanosis, Peripheral Cyanosis, Central Cyanosis, Jaundiced, Carotenemia

  **Trauma**

    No: Deformity, Swelling, Edema, Hematoma, Abrasion

  **Nails**

    Yes: Within Normal Limits

    No: Discoloration, Mycotic, Thickened, Clubbing, Paronychia

  **Drains**

    No: Present (If yes, document below), Hemovac, Jackson Pratt (JP) Drain, Penrose Drain, Pigtail Drain, Wound Vac

**Head**

  **General**

    Yes: Symmetry of Motor Function, Atraumatic/Normocephalic

    No: Facial Asymmetry

  **Temporal Mandibular Joint**

    Yes: Normal Exam, Full Range of Motion, Symmetric, Normal Bony Landmarks

    No: Decreased Range of Motion

**Eyes**

  **General**

    Yes: Extraocular Movements Intact

| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | | Reg #: | 09485-104 |
|---|---|---|---|---|
| Date of Birth: 09/21/1947 | | Sex: M  Race: BLACK | Facility: | BUF |
| Encounter Date: 08/10/2021 07:42 | | Provider: Valdez, Michael MD | Unit: | V05 |

Yes: Normal Exam, Full Range of Motion, Normal Bony Landmarks, Symmetric

**Tibia / Fibula**

Yes: Normal Exam, Normal Bony Landmarks, Symmetric

**Ankle/Foot/Toes**

Yes: Normal Exam, Full Range of Motion, Normal Bony Landmarks, Symmetric

**Ankle/Foot/Toes ROM and Tests**

No: Decreased Sensation to Monofilament

**Chest Wall**

Yes: Normal Exam, Normal Bony Landmarks, Symmetric

**Back**

Yes: Normal Exam, Normal Bony Landmarks, Symmetric

**Neurologic**

**Cranial Nerves (CN)**

Yes: Within Normal Limits, CN 2-12 Intact Grossly

**Coordination - Gait**

Yes: Normal Gait

## ASSESSMENT:

Enlarged prostate without lower urinary tract symptoms (BPH), N400 - Current

Essential (primary) hypertension, I10 - Current

Gastro-esophageal reflux disease without esophagitis, K219 - Current

Hyperlipidemia, unspecified, E785 - Current

Unspecified disorder of vitreous body, H439 - Current

## PLAN:

**New Medication Orders:**

| Rx# | Medication | Order Date |
|---|---|---|
| | Losartan Tablet | 08/10/2021 07:42 |
| | **Prescriber Order:**  100mg Orally -  daily x 180 day(s) | |
| | Indication:  Essential (primary) hypertension | |
| | Sulfamethoxazole/Trimeth DS 800-160 Mg Tablet | 08/10/2021 07:42 |
| | **Prescriber Order:**  one tab Orally -  Two Times a Day x 7 day(s) | |
| | Indication:  Urinary tract infection, site not specified | |

**Discontinued Medication Orders:**

| Rx# | Medication | Order Date |
|---|---|---|
| 1687349-BUX | *Losartan potassium  25 MG Tab* | 08/10/2021 07:42 |
| | **Prescriber Order:**  *Take three tablets (75 MG) by mouth each day* | |
| | Discontinue Type:  *When Pharmacy Processes* | |
| | Discontinue Reason:  *new order written* | |
| | Indication: | |

**New Laboratory Requests:**

| Details | Frequency | Due Date | Priority |
|---|---|---|---|

# Bureau of Prisons
# Health Services
# Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | | | Reg #: | 09485-104 |
| Date of Birth: | 09/21/1947 | Sex: | M    Race: BLACK | Facility: | BUF |
| Note Date: | 07/28/2021 07:56 | Provider: | Valdez, Michael MD | Unit: | V05 |

Cosign Note - Chart Review encounter performed at Health Services.

**Administrative Notes:**

ADMINISTRATIVE NOTE   1        Provider:   Valdez, Michael MD

lab noted: cbc cmp ldl psa stable

**Copay Required:** No          **Cosign Required:** No
**Telephone/Verbal Order:** No

Completed by Valdez, Michael MD on 07/28/2021 07:56

# Bureau of Prisons
# Health Services
# Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | | | Reg #: | 09485-104 |
| Date of Birth: | 09/21/1947 | Sex: M | Race: BLACK | Facility: | BUF |
| Note Date: | 07/14/2021 10:04 | Provider: | Valdez, Michael MD | Unit: | V05 |

Cosign Note - Chart Review encounter performed at Health Services.

**Administrative Notes:**

ADMINISTRATIVE NOTE  1          Provider:   Valdez, Michael MD

gu consult noted recs processed.

**Renew Medication Orders:**

| Rx# | Medication | Order Date |
|---|---|---|
| 1622965-BUX | Tamsulosin HCl 0.4 MG Cap | 07/14/2021 10:04 |

**Prescriber Order:**  Take one capsule (0.4 MG) by mouth each day 30 minutes after the same meal each day x 365 day(s)

Indication:   Enlarged prostate without lower urinary tract symptoms (BPH)

| 1622962-BUX | amLODIPine 10 MG TAB | 07/14/2021 10:04 |
|---|---|---|

**Prescriber Order:**  Take one tablet (10 MG) by mouth each day x 365 day(s)

Indication:   Essential (primary) hypertension

| 1622963-BUX | Atorvastatin 20 MG TAB | 07/14/2021 10:04 |
|---|---|---|

**Prescriber Order:**  Take one tablet (20 MG) by mouth each day for control of cholesterol x 365 day(s)

Indication:   Hyperlipidemia, unspecified

**New Consultation Requests:**

| Consultation/Procedure | Target Date | Scheduled Target Date | Priority | Translator | Language |
|---|---|---|---|---|---|
| Urology | 09/30/2021 | 09/30/2021 | Routine | No | |

Subtype:

Inhouse Procedure

Reason for Request:

inmate with luts seen by gu with recs for cystoscopy

**Copay Required:** No          **Cosign Required:**  No

**Telephone/Verbal Order:**  No

Completed by Valdez, Michael MD on 07/14/2021 10:06



**UNITED STATES GOVERNMENT**
**Federal Bureau of Prisons**
*Low Security Correctional Institution*
*Butner, North Carolina, 27509*

Health Services Department
Memorandum of Acknowledgment

RENTERIA GRANADOS    09485-104
LUIS
Inmate Name                          Inmate Register Number

VO5 21 L
Housing Unit Assignment

☒ **Institution Prescription Glasses Received**

You have received a pair of prescription glasses from the Health Services
Department today and it is your responsibility to care for the glasses.   Your
prescription is valid for one (1) year from the date you were seen by the
Optometrist, not date of this receipt.

If your glasses are lost, stolen, broken or altered in any way, you are to submit an
electronic cop-out to Health Services.    A replacement pair will be determined on
an individual basis.

Broken glasses may be repaired by submitting an electronic cop-out to Health
Services.    You will be placed on the callout to bring the broken glasses and any
pieces (to include arms, lenses, etc.) to send out for repair.

☐ **Repaired Institution Prescription Glasses Received**

You have received your prescription glasses back from being repaired at the
Unicor factory located at FCC Butner.   If you have any further issues with them,
submit an electronic cop-out to Health Services.

_____          7 12 2021
Inmate Signature                         Today's Date

R. Nelson, HS-A /                        7/12/21
Staff Printed Name / Signature           Today's Date

# Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | | | Reg #: | 09485-104 |
| Date of Birth: | 09/21/1947 | Sex: | M      Race: BLACK | Facility: | BUF |
| Note Date: | 07/09/2021 13:11 | Provider: | Valdez, Michael MD | Unit: | V05 |

Cosign Note - Chart Review encounter performed at Health Services.

**Administrative Notes:**

ADMINISTRATIVE NOTE    1            Provider:   Valdez, Michael MD

hand written gu consult noted; await dictation for full recs review .

**Copay Required:** No          **Cosign Required:**  No

**Telephone/Verbal Order:**   No

Completed by Valdez, Michael MD on 07/09/2021 13:11

# Bureau of Prisons
# Health Services
## Consultation Request

| Inmate Name: RENTERIA GRANADOS, LUIS ENRIQUE | Reg #: 09485-104 | Complex: BUX |
|---|---|---|
| Date of Birth:      09/21/1947 | Sex:    M | |

**Report of Consultation:** Urology                    **Subtype:** Inhouse Clinic

Inmate Name: RENTERIA GRANADOS, LUIS ENRIQUE                    Reg #:      09485-104
Date of Birth: 09/21/1947                                       Sex:        M
Institution:   BUTNER LOW FCI
               OLD NC HWY 75
               BUTNER,North Carolina 27509
               9195755000

**Assessment:**

*PVR 4/13/21 neg*
*73*

**Plan:**

*A/P 1 – LUTS*
*cystoscopy @ FMC, flomax 0.4mg*
*2 – ↑PSA*
*follow ? MRI*

**Signature**
**Date**

Completed By:

*7/9/21  Job# 997398*

Report may be hand-written or (preferably) typed on this form.  If dictated on office or hospital letterhead to follow, please indicate essential findings or recommendations to be acted upon pending final report.

Follow-up services and primary responsibility for inmate health care remains with Bureau of Prisons staff.  While discussion of diagnostic/treatment options with the inmate may be appropriate, they are subject to review by the inmate's primary care provider, the institution utilitzation review committee and/or the BOP National Formulary.

Please notify institution prior to scheduling surgery dates or follow-up appointments.

**Inmate not to be informed of appointment dates.**

## Bureau of Prisons
## Health Services
## Consultation Request

7-9-21

| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | Reg #: | 09485-104 | Complex: BUX |
|---|---|---|---|---|
| Date of Birth: | 09/21/1947 | Sex: | M | |

**Consultation/Procedure Requested:**     Urology

**Subtype:**     Inhouse Clinic

**Priority:**  Routine

**Target Date:**  03/01/2021

**Reason for Request:**

inmate with lower urinary tract symptoms. with recs for cystoscopy

**Medications (As of 07/08/2021)**

Aspirin 81 MG EC Tab  Exp: 10/12/2021  SIG: Take one tablet (81 MG) by mouth each day

Losartan potassium  25 MG Tab  Exp: 10/12/2021  SIG: Take three tablets (75 MG) by mouth each day

Omeprazole 20 MG Cap  Exp: 10/12/2021  SIG: Take two capsules (40 MG) by mouth each day on empty stomach

**Allergies (As of 07/08/2021)**

ACE Inhibitors

**Health Problems (As of 07/08/2021)**

Essential (primary) hypertension, Enlarged prostate without lower urinary tract symptoms (BPH), Unspecified disorder of vitreous body, Low vision, one eye, normal vision other eye, Hyperlipidemia, unspecified, Gastro-esophageal reflux disease without esophagitis, Dental caries on smooth surface penetrating into pulp, Abnormal results of function studies of organs and systems, LTBI Prophy Complete in BOP, Epididymitis, Prediabetes, Acute respiratory distress syndrome, Nontraumatic hematoma of soft tissue, Coronavirus COVID-19 test negative, Urinary tract infection, site not specified, Personal history of COVID-19

**Inmate Requires Translator:**  No          **Language:**

**Additional Records Required:**

**Comments:**

3/26 clinic cx due to covid outbreak

**Requested By:**     Valdez, Michael MD

**Ordered Date:**     01/13/2021 12:00

**Scheduled Target Date:** 03/01/2021 00:00

**Level of Care:**     Medically Necessary - Non-Emergent

## Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | | | Reg #: | 09485-104 |
| Date of Birth: | 09/21/1947 | Sex: | M     Race: BLACK | Facility: | BUF |
| Note Date: | 05/18/2021 07:59 | Provider: | Valdez, Michael MD | Unit: | V05 |

Cosign Note - Chart Review encounter performed at Health Services.
**Administrative Notes:**

ADMINISTRATIVE NOTE   **1**        Provider:   Valdez, Michael MD

optometry consult noted: follow up consult requests already placed.

**Copay Required:** No          **Cosign Required:**  No
**Telephone/Verbal Order:**   No

Completed by Valdez, Michael MD on 05/18/2021 08:00

**Bureau of Prisons**
**Health Services**
**Clinical Encounter - Administrative Note**

| | | | | | | |
|---|---|---|---|---|---|---|
| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | | | | Reg #: | 09485-104 |
| Date of Birth: | 09/21/1947 | Sex: | M | Race: BLACK | Facility: | BUF |
| Note Date: | 05/18/2021 07:58 | Provider: | Valdez, Michael MD | | Unit: | V05 |

Admin Note - Chart Review encounter performed at Health Services.
**Administrative Notes:**

ADMINISTRATIVE NOTE   **1**        Provider:   Valdez, Michael MD
inmate with htn cataracts for routine follow up.

**New Consultation Requests:**

| Consultation/Procedure | Target Date | Scheduled Target Date | Priority | Translator | Language |
|---|---|---|---|---|---|
| Optometry | 05/31/2023 | 05/31/2023 | Routine | No | |

Subtype:
Onsite.
Reason for Request:
inmate with htn cataracts for routine follow up.

**Copay Required:** No          **Cosign Required:**  No
**Telephone/Verbal Order:**   No

Completed by Valdez, Michael MD on 05/18/2021 07:59

# Bureau of Prisons
## Health Services
## Clinical Encounter

| | | | | |
|---|---|---|---|---|
| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | | Reg #: | 09485-104 |
| Date of Birth: | 09/21/1947 | Sex:   M   Race: BLACK | Facility: | BUF |
| Encounter Date: | 05/04/2021 09:04 | Provider:   Meyer, Caleb APRN- | Unit: | V05 |

Admin Note - Chart Review encounter at Health Services.
**Reason Not Done:**   No Show

**Comments:** No show for visit to check on wheelchair. To return to sick call as needed and have wheelchair checked out in VT.
**Cosign Required:** No
Completed by Meyer, Caleb APRN-CNP on 05/04/2021 09:05.

BP-A1136
FEB 21
U.S. DEPARTMENT OF JUSTICE

COVID-19 VACCINE CONSENT - INMATE

FEDERAL BUREAU OF PRISONS

I have been provided a copy of the COVID-19 Vaccine **Emergency Use Authorization (EUA)** fact sheet dated **4/6/21**.  I have had the opportunity to ask questions about the benefits and risks of vaccination, including if I am pregnant, breastfeeding or have a weakened immune system. I will agree to complete the number of vaccine doses as appropriate and indicated by the manufacturer.

Health Questions Prior to COVID-19 Vaccination (*Check yes or no*)

| Yes | No | Health Questions |
|---|---|---|
| ☑ | ☒ | Are you sick today? |
| ☐ | ☒ | Have you ever had a severe allergy (i.e., anaphylaxis) or an immediate allergic reaction of any severity to any component of this vaccine or to a previous dose of this vaccine? |
| ☐ | ☒ | Have you ever had an immediate allergic reaction to any other vaccine/injectable therapy? |
| ☐ | ☒ | Have you had any other vaccinations in the last 14 days? |
| ☐ | ☒ | Have you received monoclonal antibody therapy for COVID-19 in the last 90 days? |

☒ I consent to receive the COVID-19 vaccination.

| Dose # (1 or 2) | Vaccine Manufacturer | Lot Number | Expiration Date | Route | Deltoid |
|---|---|---|---|---|---|
| 2 | Pfizer | EW0176 | 8/31/21 | IM | ☒ Left  ☐ Right |

| Inmate Signature | Date |
|---|---|
| Luis Renteria | 0948 04-27-21 |

| Administered by Signature | Date |
|---|---|
| A. Pownal (NP) | 4/27/21 |

Administered by (name/title)
A. Pownal

☐ I decline to receive the COVID-19 vaccination.

| Inmate Signature | Date |
|---|---|
|  |  |

| Witness Signature | Date |
|---|---|
|  |  |

| (PRINT) Witness Name |  |
|---|---|
|  |  |

| (PRINT) Inmate Name (Last, First) | Register Number |
|---|---|
| Renteria Granados, Luis | 09485-104 |

| Institution | Unit | Work Assignment |
|---|---|---|
| LSCI | VA |  |

DOCUMENT VACCINE ADMINISTRATION IN BEMR FLOW SHEETS
SCAN VACCINE CONSENT IN BEMR DOCUMENT MANAGER – VACCINATION CONSENT

PDF

Prescribed by PS6190

New
Wheelchair Needed

**Bureau of Prisons**
**Health Services**
**Clinical Encounter - Administrative Note**

| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | | | Reg #: | 09485-104 |
|---|---|---|---|---|---|
| Date of Birth: | 09/21/1947 | Sex: | M     Race: BLACK | Facility: | BUF |
| Note Date: | 04/15/2021 07:59 | Provider: | Meyer, Caleb APRN- | Unit: | V05 |

Admin Note - Chart Review encounter performed at Health Services.
**Administrative Notes:**

   ADMINISTRATIVE NOTE   1         Provider:   Meyer, Caleb APRN-CNP
      A chart review has been conducted including labs, recent notes, medications, and diagnosis.  Chart review
      data indicates that patient is stable on current medication therapy, no medication changes indicated.  A refill of
      medications will be entered to prevent lapse of therapy before next scheduled chronic care visit.

      Inmate allergies reviewed and needed updates were applied during this visit -- see Chart:Allergies for current
      inmate allergy list.

**Renew Medication Orders:**

| Rx# | Medication | Order Date |
|---|---|---|
| 1648653-BUX | Losartan potassium  25 MG Tab | 04/15/2021 07:59 |
| | **Prescriber Order:**   Take three tablets (75 MG) by mouth each day ***note increased dose*** x 180 day(s) | |
| | Indication:   Essential (primary) hypertension | |
| 1626373-BUX | Omeprazole 20 MG Cap | 04/15/2021 07:59 |
| | **Prescriber Order:**   Take two capsules (40 MG) by mouth each day on empty stomach x 180 day(s) | |
| | Indication:   Gastro-esophageal reflux disease without esophagitis | |
| 1625546-BUX | Aspirin 81 MG EC Tab | 04/15/2021 07:59 |
| | **Prescriber Order:**    Take one tablet (81 MG) by mouth each day x 180 day(s) | |
| | Indication:   Hyperlipidemia, unspecified | |

**Copay Required:** No         **Cosign Required:**  No
**Telephone/Verbal Order:**  No

Completed by Meyer, Caleb APRN-CNP on 04/15/2021 08:01

# Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

| | | | | | | |
|---|---|---|---|---|---|---|
| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | | | Reg #: | 09485-104 | |
| Date of Birth: | 09/21/1947 | Sex: | M    Race: BLACK | Facility: | BUF | |
| Note Date: | 04/13/2021 14:01 | Provider: | Skipper, A. RN | Unit: | V05 | |

*Admin Note - General Administrative Note encounter performed at Health Services.*
**Administrative Notes:**

ADMINISTRATIVE NOTE   1          Provider:   Skipper, A. RN

Inmate returned from CTO trip.
Inmate states he was seen by radiology at the FMC.
Inmate denies any problems at this time and was sent back to his housing unit.

**Copay Required:** No          **Cosign Required:**  No
**Telephone/Verbal Order:**   No

Completed by Skipper, A. RN on 04/13/2021 14:02

Requested to be reviewed by  Valdez, Michael MD.

Review documentation will be displayed on the following page.

**Bureau of Prisons**
**Health Services**
**Cosign/Review**

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | | | Reg #: | 09485-104 |
| Date of Birth: | 09/21/1947 | Sex: | M | Race: | BLACK |
| Encounter Date: | 04/13/2021 14:01 | Provider: | Skipper, A. RN | Facility: | BUF |

**Reviewed by Valdez, Michael MD on 04/14/2021 08:07.**

## RADIOLOGIC REPORT

**U.S. DEPARTMENT OF JUSTICE**                                    **FEDERAL BUREAU OF PRISONS**

| Patient Identification:<br>Name, Reg #, Date of Birth, Institution<br><br>**RENTERIA GRANADOS, LUIS ENRIQUE**<br>**Reg. #:**  09485-104<br>**DOB:**    09/21/1947 | Facility: Butner   LSCI<br><br>Requested By:<br>Michael Valdez, MD | Exam(s) Requested:<br><br>Ultrasound - Pelvis. |
|---|---|---|

Reasons for Study/Provisional Diagnosis as per Referring Clinician *[per request form]*.
Lower urinary tract symptoms.

| Date of Study:<br>04/13/2021 | Date of Dictation:<br>04/13/2021 | Dictation Received:<br>04/13/2021 | Dictation Transcribed:<br>04/13/2021 |
|---|---|---|---|

### Sensitive but Unclassified

**TECHNIQUE:** Pre and post void sonographic imaging of the urinary bladder is performed.

**COMPARISON:** None.

**FINDINGS:**
The pre void bladder volume is estimated to the 171 mL. After voiding, the bladder volume is 78 mL. No mass is seen within the urinary bladder.

**IMPRESSION:**
Post void residual within the urinary bladder. Volumes are reported above. No sonographic evidence of a bladder mass.

| Signature:<br>          CHRISTOPHER M. CEPEDA, M.D.<br>*Electronically Signed by CHRISTOPHER M. CEPEDA, M.D.*<br>*04/13/2021 12:18* | Location of Radiologic Facility:<br>Butner |
|---|---|

Job No: 367590   MT: 0951                                                                   Page 1 of 1

| BP-PENDING | **COVID-19 VACCINE CONSENT – INMATE** | CDFRM JAN |
| U.S. DEPARTMENT OF JUSTICE | | FEDERAL BUREAU OF PRISONS |

I have been provided a copy of the COVID-19 Vaccine **Emergency Use Authorization (EUA)** fact sheet dated _____.  I have had the opportunity to ask questions about the benefits and risks of vaccination, including if I am pregnant, breastfeeding or have a weakened immune system. I will agree to complete the number of vaccine doses as appropriate and indicated by the manufacturer.

### Health Questions Prior to COVID-19 Vaccination (*Check yes or no*)

| Yes | No | Health Questions |
|---|---|---|
| ☐ | ☐ | Are you sick today? |
| ☐ | ☐ | Have you ever had a severe allergy (i.e., anaphylaxis) or an immediate allergic reaction of any severity to any component of this vaccine or to a previous dose of this vaccine? |
| ☐ | ☐ | Have you ever had an immediate allergic reaction to any other vaccine/injectable therapy? |
| ☐ | ☐ | Have you had any other vaccinations in the last 14 days? |
| ☐ | ☐ | Have you received monoclonal antibody therapy for COVID-19 in the last 90 days? |

☐  I consent to receive the COVID-19 vaccination.

| Dose # (1 or 2) | Vaccine Manufacturer | Lot Number | Expiration Date | Route | Deltoid (R) Deltoid (L) |
|---|---|---|---|---|---|
| | | | | | |

| Inmate Signature | | Date |
|---|---|---|
| | | |

| Administered by Signature | | Date |
|---|---|---|
| | | |

| Administered by (name/title) |
|---|
| |

☒  I decline to receive the COVID-19 vaccination.

| Inmate Signature | Date |
|---|---|
| *[signature]* | 2·11-21 |
| Witness Signature | Date |
| *[signature]* | 2-11-21 |
| (PRINT) Witness Name | |
| CALEB MEYER ALRN-CNN | |

| (PRINT) Inmate Name (Last, First) | Register Number |
|---|---|
| RENTERIA-GRANADOS, Luis | 09485-104 |
| Institution | Unit | Work Assignment |
| LSC1 | VA | Unassigned |

DOCUMENT VACCINE ADMINISTRATION IN BEMR FLOW SHEETS.
SCAN VACCINE CONSENT IN BEMR DOCUMENT MANAGER – VACCINATION CONSENT

# Bureau of Prisons
# Health Services
# Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | | | Reg #: | 09485-104 |
| Date of Birth: | 09/21/1947 | Sex: | M     Race:BLACK | Facility: | BUF |
| Note Date: | 01/13/2021 12:00 | Provider: | Valdez, Michael MD | Unit: | V05 |

Review Note - Chart Review encounter performed at Health Services.

**Administrative Notes:**

ADMINISTRATIVE NOTE   **1**        Provider:   Valdez, Michael MD

inmate seen by gu. recs processed

**New Medication Orders:**

| Rx# | Medication | Order Date |
|---|---|---|
| | Nitrofurantoin Mono 100 MG (Macrobid) Cap | 01/13/2021 12:00 |

**Prescriber Order:**     100mg Orally  -  Two Times a Day x 7 day(s)

Indication:   Enlarged prostate without lower urinary tract symptoms (BPH)

**New Radiology Request Orders:**

| Details | Frequency | End Date | Due Date | Priority |
|---|---|---|---|---|
| Ultrasound-Pelvis-Pre and Post Void | One Time | | 02/26/2021 | Routine |

Specific reason(s) for request (Complaints and findings):

inmate with lower urinary tract symptoms

**New Consultation Requests:**

| Consultation/Procedure | Target Date | Scheduled Target Date | Priority | Translator | Language |
|---|---|---|---|---|---|
| Urology | 03/01/2021 | 03/01/2021 | Routine | No | |

Subtype:

Inhouse Clinic

Reason for Request:

inmate with lower urinary tract symptoms, with recs for cystoscopy

**Copay Required:** No          **Cosign Required:** No

**Telephone/Verbal Order:**   No

Completed by Valdez, Michael MD on 01/13/2021 12:06

# Bureau of Prisons
# Health Services
# Clinical Encounter - Administrative Note

| | | | | | | |
|---|---|---|---|---|---|---|
| Inmate Name: | RENTERIA GRANADOS, LUIS ENRIQUE | | | | Reg #: | 09485-104 |
| Date of Birth: | 09/21/1947 | Sex: | M | Race: BLACK | Facility: | BUF |
| Note Date: | 03/13/2019 09:15 | Provider: | Reddy, Edavally M.D. | | Unit: | V02 |

Review Note - Report Review encounter performed at Health Services.

**Administrative Notes:**

    **ADMINISTRATIVE NOTE   1**       **Provider:** Reddy, Edavally M.D.

        CT chest/ abd and pelvis report of 3/2019 reviewed. Stable 4mm left lung nodule:

**Copay Required:** No        **Cosign Required:** No

**Telephone/Verbal Order:**   No

Completed by Reddy, Edavally M.D. on 03/13/2019 09:16

# RADIOLOGIC REPORT

**U.S. DEPARTMENT OF JUSTICE**                          **FEDERAL BUREAU OF PRISONS**

| Patient Identification:<br>Name, Reg #, Date of Birth, Institution<br><br>**RENTERIA GRANADOS, LUIS ENRIQUE**<br>**Reg. #:**   09485-104<br>**DOB:**    09/21/1947 | Facility: Butner LSCI<br><br>Requested By:<br>MICHAEL NWUDE, MD | Exam(s) Requested:<br><br>CT - Chest/Abdomen/Pelvis - With Contrast. |
|---|---|---|

| Reasons for Study/Provisional Diagnosis as per Referring Clinician *[per request form]*.<br>Follow-up pulmonary nodule and adrenal gland nodularity. ||||
|---|---|---|---|
| Date of Study:<br>03/07/2019 | Date of Dictation:<br>03/07/2019 | Dictation Received:<br>03/07/2019 | Dictation Transcribed:<br>03/07/2019 |

### Sensitive but Unclassified

**TECHNIQUE:** Helical axial CT images are obtained from the thoracic inlet to the pubic symphysis following oral and intravenous contrast administration.

**CONTRAST:** 125 mL Isovue-300.

**COMPARISON:** Chest CT from 03/08/2018.

**FINDINGS:**

Chest: There is no pleural or pericardial effusion. There is no pathologically enlarged mediastinal or hilar lymphadenopathy. There is no airspace consolidation. There is linear scarring in the posterior left upper lobe. There is subsegmental atelectasis in the left lower lobe. There is a stable 4 mm left upper lobe nodule on series 2, image 23. No new pulmonary nodules are seen.

Abdomen/Pelvis: The liver, spleen, pancreas, kidneys and adrenals are normal in appearance. There is no abdominal or pelvic lymphadenopathy. There is no ascites. There is no bowel wall thickening. There is left-sided colonic diverticulosis.

The prostate is diffusely enlarged. The enlarged prostate produces mass effect upon the bladder.

No lytic or blastic bone lesions are seen in the regional skeleton.

There is no evidence of abdominal aortic aneurysm.

**IMPRESSION:**
1. Stable nonspecific 4 mm left upper lobe pulmonary nodule.
2. Enlarged prostate.
3. Left-sided colonic diverticulosis.
4. No acute abnormalities identified within the chest, abdomen or pelvis.

| Signature:<br><br>*Cc*<br>CHRISTOPHER M. CEPEDA, M.D. | Location of Radiologic Facility:<br>Butner |
|---|---|

<u>**EXHIBIT 2:**</u>
- **Individualized Needs Plan – Program Review**
- **Male Custody Classification Form**
- **Sentence Monitoring Computation Data**



**Individualized Needs Plan - Program Review     (Inmate Copy)**     SEQUENCE: 02022043
Dept. of Justice / Federal Bureau of Prisons              Team Date: 11-18-2021
Plan is for inmate: RENTERIA GRANADOS, LUIS ENRIQUE  09485-104

| | | | |
|---|---|---|---|
| Facility: | BUF  BUTNER LOW FCI | Proj. Rel. Date: | 08-02-2024 |
| Name: | RENTERIA GRANADOS, LUIS ENRIQUE | Proj. Rel. Mthd: | GCT REL |
| Register No.: | **09485-104** | DNA Status: | MIM17157 / 09-01-2016 |
| Age: | 74 | | |
| Date of Birth: | 09-21-1947 | | |

**Detainers**

| Detaining Agency | Remarks |
|---|---|
| ICE | HAS BEEN CONVICTED OF AN OFFENSE CLASSIFIED AS A THAN A STATE OR LOCAL OFFENSE FOR WHICH AN ESSENTIAL WAS THE ALIEN'S IMMIGRATION STATUS |

**Pending Charges**

| |
|---|
| BICE detainer |

**Current Work Assignments**

| Facl | Assignment | Description | Start |
|---|---|---|---|
| BUF | A&O COMPL | COMPLETED A&O | 04-13-2021 |

**Current Education Information**

| Facl | Assignment | Description | Start |
|---|---|---|---|
| BUF | ESL EXEMPT | ESL NEED-PERMANENTLY EXEMPT | 03-06-2018 |
| BUF | GED HAS | COMPLETED GED OR HS DIPLOMA | 04-05-2019 |

**Education Courses**

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| BUF | C | LIFE SKILLS MATH-INTEREST&% SP | 10-14-2021 | 11-05-2021 |
| BUF | C | REENTRY-SP (UB) | 10-14-2021 | 11-05-2021 |
| BUF | C | SHU SOCIAL STUDIES SP IND ST | 08-12-2021 | 09-08-2021 |
| BUF | C | SHU VISUAL INFORMATION SP | 05-13-2021 | 06-03-2021 |
| BUF | C | SHU CRITICAL THINKING SP | 03-16-2021 | 04-15-2021 |
| BUF | C | SPANISH CDL | 02-07-2020 | 08-26-2020 |
| BUF | C | INSIDE OUT DAD | 01-14-2020 | 03-10-2020 |
| BUF | C | WELLNESS SPINNING CLASS | 01-17-2020 | 02-08-2020 |
| BUF | C | BASIC ELECTRICITY (SPANISH) | 10-21-2019 | 12-19-2019 |
| BUF | C | MEDICINE BALL COURSE | 10-11-2019 | 12-06-2019 |
| BUF | C | INTRO TO TYPING | 08-12-2019 | 10-07-2019 |
| BUF | W | SPANISH GED 12:30-2:30 MF | 04-27-2018 | 08-03-2018 |
| BUF | C | INTRO TO EDUCATION | 03-01-2018 | 03-15-2018 |

**Discipline History (Last 6 months)**

| Hearing Date | Prohibited Acts |
|---|---|
| ** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ** | |

**Current Care Assignments**

| Assignment | Description | Start |
|---|---|---|
| CARE1-MH | CARE1-MENTAL HEALTH | 03-05-2018 |
| CARE3 | UNSTABLE, COMPLEX CHRONIC CARE | 03-21-2017 |

**Current Medical Duty Status Assignments**

| Assignment | Description | Start |
|---|---|---|
| C19-RCVRD | COVID-19 RECOVERED | 06-29-2020 |
| LOWER BUNK | LOWER BUNK REQUIRED | 06-29-2020 |
| NO PAPER | NO PAPER MEDICAL RECORD | 02-21-2018 |
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 04-06-2017 |
| YES F/S | CLEARED FOR FOOD SERVICE | 04-06-2017 |

**Current Drug Assignments**

| Assignment | Description | Start |
|---|---|---|
| | | |



| | **Individualized Needs Plan - Program Review   (Inmate Copy)** | SEQUENCE: 02022043 |
|---|---|---|
| | Dept. of Justice / Federal Bureau of Prisons | Team Date: 11-18-2021 |
| | Plan is for inmate: RENTERIA GRANADOS, LUIS ENRIQUE  09485-104 | |

| Assignment | Description | Start |
|---|---|---|
| ED NONE | DRUG EDUCATION NONE | 04-07-2019 |

**FRP Payment Plan**

| Most Recent Payment Plan |
|---|

| **FRP Assignment:** | **COMPLT** | **FINANC RESP-COMPLETED** | **Start: 11-15-2018** |
|---|---|---|---|

| Inmate Decision: | **AGREED** | **$75.00** | Frequency: **SINGLE** |
|---|---|---|---|
| Payments past 6 months: | **$0.00** | | Obligation Balance: **$0.00** |

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $100.00 | $0.00 | IMMEDIATE | COMPLETEDZ |

** NO ADJUSTMENTS MADE IN LAST 6 MONTHS **

**FRP Deposits**

Trust Fund Deposits - Past 6 months:  $2,970.00          Payments commensurate ?   N/A

New Payment Plan:  ** No data **

**Current FSA Assignments**

| Assignment | Description | Start |
|---|---|---|
| FTC INELIG | FTC-INELIGIBLE-REVIEWED | 11-13-2021 |
| N-ANGER N | NEED - ANGER/HOSTILITY NO | 11-13-2021 |
| N-ANTISO N | NEED - ANTISOCIAL PEERS NO | 11-13-2021 |
| N-COGNTV Y | NEED - COGNITIONS YES | 11-13-2021 |
| N-DYSLEX N | NEED - DYSLEXIA NO | 05-28-2021 |
| N-EDUC N | NEED - EDUCATION NO | 11-13-2021 |
| N-FIN PV Y | NEED - FINANCE/POVERTY YES | 11-13-2021 |
| N-FM/PAR N | NEED - FAMILY/PARENTING NO | 11-13-2021 |
| N-M HLTH N | NEED - MENTAL HEALTH NO | 11-13-2021 |
| N-MEDICL Y | NEED - MEDICAL YES | 11-13-2021 |
| N-RLF Y | NEED - REC/LEISURE/FITNESS YES | 11-13-2021 |
| N-SUB AB N | NEED - SUBSTANCE ABUSE NO | 11-13-2021 |
| N-TRAUMA N | NEED - TRAUMA NO | 11-13-2021 |
| N-WORK Y | NEED - WORK YES | 11-13-2021 |
| R-MIN | MINIMUM RISK RECIDIVISM LEVEL | 11-13-2021 |

**Progress since last review**

| Since last review, has completed various programs. Has maintained clear conduct since last review. |
|---|

**Next Program Review Goals**

| (Cognitions Need)  Enroll and complete the Coping Skills program prior to next review May 2022. Obtain work assignment if medically cleared. Maintain contact with family and friends by either TruLincs, visitation, writing and/or calling at least twice a month thru next review. |
|---|

**Long Term Goals**

| (Medical Need)  Enroll in Brain Health as You Age prior to August 2024. Unit Team recommends saving 1 to 3 dollars per month for release preparation. |
|---|

**RRC/HC Placement**

| No. Criminal alien releasing to custody of ICE. |
|---|

**Comments**

| Inmate Financial Responsibility Program Completed. |
|---|
| Maintain clear conduct daily thru PRD by not incurring any incident reports. |
| Maintain personal hygiene and room sanitation daily thru next review. |
| Maintain physical well-being through health promotion and disease prevention strategies such as a healthy lifestyle and habits, routine medical care, regular exercise, and appropriate diet. |

```
BUFDO  606.00 *      MALE CUSTODY CLASSIFICATION FORM      *    12-15-2021
PAGE 001 OF 001                                                    12:03:33
                        (A) IDENTIFYING DATA
REG NO..: 09485-104           FORM DATE: 07-01-2021        ORG: BUF
NAME....: RENTERIA GRANADOS, LUIS ENRIQUE
                                    MGTV: NONE
PUB SFTY: ALIEN                     MVED:
                        (B) BASE SCORING
DETAINER: (0) NONE            SEVERITY.......: (3) MODERATE
MOS REL.: 37                  CRIM HIST SCORE: (00) 0 POINTS
ESCAPES.: (0) NONE            VIOLENCE.......: (0) NONE
VOL SURR: (0) N/A             AGE CATEGORY...: (0) 55 AND OVER
EDUC LEV: (0) VERFD HS DEGREE/GED  DRUG/ALC ABUSE.: (1) <5 YEARS
                        (C) CUSTODY SCORING
TIME SERVED.....: (4) 26-75%  PROG PARTICIPAT: (2) GOOD
LIVING SKILLS...: (1) AVERAGE TYPE DISCIP RPT: (5) NONE
FREQ DISCIP RPT.: (3) NONE    FAMILY/COMMUN..: (4) GOOD


            --- LEVEL AND CUSTODY SUMMARY ---

BASE CUST VARIANCE  SEC TOTAL   SCORED LEV MGMT SEC LEVEL  CUSTODY  CONSIDER
 +4   +19   -3       +1          LOW          N/A            IN     DECREASE


G0005        TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```

34

```
  BUFD0  540*23 *              SENTENCE MONITORING        *     12-15-2021
  PAGE 001        *            COMPUTATION DATA           *     12:03:55
                               AS OF 12-15-2021
```

REGNO..: 09485-104 NAME: RENTERIA GRANADOS, LUIS ENRIQUE        *EXHIBIT A, 1*


FBI NO...........: 7P11H09T7          DATE OF BIRTH: 09-21-1947  AGE:  74
ARS1.............: BUF/A-DES
UNIT.............: VANCEA              QUARTERS.....: V05-021L
DETAINERS........: YES                NOTIFICATIONS: NO

HOME DETENTION ELIGIBILITY DATE: 02-02-2024

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE:  08-02-2024 VIA GCT REL


----------------------CURRENT JUDGMENT/WARRANT NO: 010 ---------------------

COURT OF JURISDICTION...........: FLORIDA, SOUTHERN DISTRICT
DOCKET NUMBER...................: 13-20801-CR-DIMITROU
JUDGE...........................: DIMITROULEAS
DATE SENTENCED/PROBATION IMPOSED: 02-24-2017
DATE COMMITTED..................: 02-09-2018
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO


                 FELONY ASSESS  MISDMNR ASSESS  FINES         COSTS
NON-COMMITTED.: $100.00         $00.00          $00.00        $00.00


RESTITUTION...: PROPERTY:  NO  SERVICES:  NO      AMOUNT:  $00.00

  REMARKS.......: DOCKET # 13-20801-CR-DIMITROULEAS

------------------------CURRENT OBLIGATION NO: 010 -------------------------
OFFENSE CODE....: 859     46:1903 MARITIME DRUG
OFF/CHG: 46:70506(B) CONSPIRACY TO POSSESS WITH INTENT TO DISTRIBUTE
         FIVE KILOGRAMS OR MORE OF COCAINE WHILE ON BOARD A VESSEL
         SUBJECT TO THE JURISDICTION OF THE UNITED STATES (CT1)

  SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
  SENTENCE IMPOSED/TIME TO SERVE.:  120 MONTHS
  TERM OF SUPERVISION............:    5 YEARS
  DATE OF OFFENSE................: 12-31-2012




G0002      MORE PAGES TO FOLLOW . . .
```

```
   BUFD0   540*23  *            SENTENCE MONITORING            *     12-15-2021
   PAGE 002        *            COMPUTATION DATA               *     12:03:55
                                 AS OF 12-15-2021

   REGNO..: 09485-104 NAME: RENTERIA GRANADOS, LUIS ENRIQUE         EXHIBIT A, 2


   ------------------------CURRENT COMPUTATION NO: 010 ------------------------

   COMPUTATION 010 WAS LAST UPDATED ON 01-31-2020 AT DSC AUTOMATICALLY
   COMPUTATION CERTIFIED ON 03-28-2017 BY DESIG/SENTENCE COMPUTATION CTR

   THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
   CURRENT COMPUTATION 010: 010 010

   DATE COMPUTATION BEGAN..........: 02-24-2017
   TOTAL TERM IN EFFECT............: 120 MONTHS
   TOTAL TERM IN EFFECT CONVERTED..:   10 YEARS
   EARLIEST DATE OF OFFENSE........: 12-31-2012

   JAIL CREDIT.....................:    FROM DATE      THRU DATE
                                       01-26-2016     02-23-2017

   TOTAL PRIOR CREDIT TIME.........: 395
   TOTAL INOPERATIVE TIME..........: 0
   TOTAL GCT EARNED AND PROJECTED..: 540
   TOTAL GCT EARNED................: 270
   STATUTORY RELEASE DATE PROJECTED: 08-02-2024
   ELDERLY OFFENDER TWO THIRDS DATE: 09-25-2022
   EXPIRATION FULL TERM DATE.......: 01-24-2026
   TIME SERVED.....................:     5 YEARS     10 MONTHS     20 DAYS
   PERCENTAGE OF FULL TERM SERVED..: 58.8
   PERCENT OF STATUTORY TERM SERVED: 69.1

   PROJECTED SATISFACTION DATE.....: 08-02-2024
   PROJECTED SATISFACTION METHOD...: GCT REL

   REMARKS.......: 03/21/17 COMP CMPLT L/ALH. 01-31-20 FSA UPDT L/SLD




   G0002      MORE PAGES TO FOLLOW . . .
```

```
 BUFD0  540*23 *         SENTENCE MONITORING        *      12-15-2021
 PAGE 003 OF 003 *         COMPUTATION DATA          *      12:03:55
                            AS OF 12-15-2021


REGNO..: 09485-104 NAME: RENTERIA GRANADOS, LUIS ENRIQUE


----------------------------- CURRENT DETAINERS: -----------------------------

DETAINER NO..: 002
DATE LODGED..: 05-17-2018
AGENCY.......: IMMIGRATION & CUSTOMS ENFORCE
AUTHORITY....: DEPARTMENT OF HOMELAND SECURITY; CARY, NC
CHARGES......: HAS BEEN CONVICTED OF AN OFFENSE CLASSIFIED AS A FELONY, OTHER
               THAN A STATE OR LOCAL OFFENSE FOR WHICH AN ESSENTIAL ELEMENT
               WAS THE ALIEN'S IMMIGRATION STATUS




S0055      NO PRIOR SENTENCE DATA EXISTS FOR THIS INMATE
```



Luis E Renteria-Granados #09484104
Low Security Correctional Institution
P.O. Box 999
Butner, NC 27509

U.S.M.S.
INSPECTED
BY: ______

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

CERTIFIED MAIL

7021 0950 0001 9632 8917

UNITED STATES POSTAL SERVICE

1000

33128

U.S. POSTAGE PAID
FCM LG ENV
BUTNER, NC
27509
MAY 02, 22
AMOUNT
**$0.00**
R2305K134292-05

Ms. Angela E. Noble
Clerk of Court
U.S. Southern District of Florida
Miami Division
400 North Miami Avenue, Room
Miami, FL 33128